**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5368**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTIES, TENNESSEE, *et al.*,
Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# APPELLANTS' MOTION FOR STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*

JOHN BAILEY
*Counsel to the Assistant Attorney General*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

STATEMENT .......... 3

ARGUMENT .......... 15

I. The Challenged Election-Security Conditions Fall Within FEMA's Statutory Authority .......... 15

II. A Stay Pending Appeal Is Warranted .......... 25

CONCLUSION .......... 27

CERTIFICATE OF COMPLIANCE

ADDENDUM

## INTRODUCTION

The government respectfully requests a stay pending appeal of the district court's order that precludes the Federal Emergency Management Agency (FEMA) from imposing five election-security conditions on the recipients of funds under the Homeland Security Grant Program. The district court improperly precluded FEMA from withholding a portion of grant funds, which FEMA had discretion to determine how to allocate, for recipients who had not adopted certain election-security measures that FEMA concluded were vital. A stay is warranted.

Under the Homeland Security Grant Program, FEMA provides grant funds to States and local jurisdictions to prepare for, prevent, and respond to acts of terrorism. In determining how to allocate those funds among different recipients and different projects, FEMA has been provided broad statutory discretion to identify potential threats from hostile actors and to allocate funds in the way that FEMA considers maximally effective to combat those threats.

The Department of Homeland Security has long understood that hostile foreign actors may attempt to infiltrate the Nation's election infrastructure and undermine confidence in the Nation's elections. As a

result, for nearly a decade, the Department has designated election infrastructure as "critical infrastructure." And for years, the Department has required Homeland Security Grant Program recipients to allocate a portion of any grant funds received to projects designed to safeguard election infrastructure.

In 2026, FEMA retained that previous minimum-allocation condition, again reiterating that election security is a national priority. FEMA also imposed additional conditions requiring grant recipients to certify (as a condition of receiving their full grant) compliance with five particular election-security measures.

The district court has now determined that those conditions are not authorized by the relevant statute. But that is incorrect. As plaintiffs and the district court have not disputed, election infrastructure is critical infrastructure, and attempts to safeguard voting systems from potential cyber or physical intrusion by hostile actors fall within the heartland of the national-security goals encompassed by the statute. In that context, FEMA may validly determine that, as a first priority, grant recipients must undertake particular steps to safeguard their election infrastructure and maintain public confidence in elections. And nothing in the relevant statutory

framework precludes FEMA from implementing that determination by requiring grant recipients to certify compliance, rather than by (for example) requiring grant recipients to expend funds first on those projects before funding other unrelated projects. That condition structure provides grant recipients more, not less, flexibility, and plainly falls within FEMA's broad authority to effectively and efficiently administer the program. The district court's contrary determination is unsupported, and its judgment should be stayed pending appeal.

## STATEMENT

1. This case concerns the Homeland Security Grant Program, a federal grant program administered by FEMA, a component of the Department of Homeland Security. *See generally* 6 U.S.C. §§ 603-609. At a high level, the program makes funds available to State, local, and tribal governments for use in "preventing, preparing for, protecting against, and responding to acts of terrorism." *Id.* § 609(a). Permitted uses of grant funds under the program include, for example, developing "homeland security, emergency management, or other relevant plans" and assessments; protecting critical infrastructure systems and assets; "purchasing, upgrading, storing, or maintaining equipment, including computer hardware and software"; and

"any other appropriate activity, as determined by the Administrator." *Id.* § 609(a)(1)-(15).

The Homeland Security Grant Program contains three subprograms, each with its own requirements. First, the State Homeland Security Grant Program "assist[s] State, local, and tribal governments in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 605(a). To obtain funds under that program, a State "may apply for a grant," and the State's application must include, "at a minimum," information about "the purpose for which the State seeks grant funds and the reasons why the State needs the grant to meet the target capabilities of that State," "a description of how the State plans to allocate the grant funds to local governments and Indian tribes," and "a budget showing how the State intends to expend the grant funds." *Id.* § 605(b). Each State receiving a grant under this program is required to "make available to local and tribal governments" at least 80% of the grant funds (or, "with the consent of local and tribal governments, items, services, or activities" with that value). *Id.* § 605(c).

Second, the Urban Area Security Initiative "provide[s] grants to assist high-risk urban areas in preventing, preparing for, protecting against, and

responding to acts of terrorism." 6 U.S.C. § 604(a). For this program, the Administrator is charged with "designat[ing] high-risk urban areas" based on "the relative threat, vulnerability, and consequences from acts of terrorism faced by" those areas. *Id.* § 604(b). Urban areas that are so designated are then eligible to apply for funding under the program. As with the State Homeland Security Grant Program, applications for funds under this program must be submitted by the relevant State, Dkt. 36-5, at 5, and any awarded funds are disbursed initially to the relevant State, which is required to pass along "not less than 80 precent of the grant funds" to "the high-risk urban area," 6 U.S.C. § 604(d). The State may, however, expend the remainder of the funds "on items, services, or activities that benefit the high-risk urban area." *Id.*

Third, Operation Stonegarden provides grants to "support[] enhanced cooperation and coordination among" federal immigration enforcement activities and "state, local, tribal, and territorial law enforcement agencies to strengthen border security." Dkt. 36-5, at 22-23. Grants under this program are focused specifically on "address[ing] border-related threats" and "secur[ing] borders, including land and water routes, and critical travel corridors." *Id.* at 23.

With the exception of a statutory requirement that each State is entitled to receive at least 0.35% "of the total funds appropriated for grants" under the State Homeland Security Grant Program, 6 U.S.C. § 605(e), Congress has not further restricted the Administrator's discretion in determining how to allocate the more than $1 billion appropriated for the Homeland Security Grant Program among different States' proposed projects. Instead, Congress has provided the Administrator with wide latitude to prioritize funds based on a number of considerations, including applicants' "degree of threat, vulnerability, and consequences related to critical infrastructure"; "the most current threat assessments available to the Department"; the "anticipated effectiveness of the proposed use of the grant" by the applicant "in increasing the ability of" the applicant "to prevent, prepare for, protect against, and respond to acts of terrorism"; and "such other factors as are specified in writing by the Administrator." *Id.* § 608(a). And Congress has specifically directed the Administrator to take account of, among other threats, the risk posed "to critical infrastructure sectors" by "[c]yber" attacks and "other types of threat determined relevant by the Administrator." *Id.* § 608(b).

2. The Department has long recognized the critical role that secure election infrastructure plays in national security. In January 2017, Secretary Jeh Johnson "determined that election infrastructure in this country should be designated" as "critical infrastructure." Dkt. 36-8, at 1. The Secretary explained that the reason for this designation was to ensure "that election infrastructure"—that is, "storage facilities, polling places," "centralized vote tabulations locations," "voter registration databases, voting machines, and other systems"—"will, on a more formal and enduring basis, be a priority for cybersecurity assistance and protections that the Department of Homeland Security provides to a range of private and public sector entities." *Id.* As the Secretary further explained, "[e]lection infrastructure is vital to our national interests, and cyber attacks on this country are becoming more sophisticated, and bad cyber actors – ranging from nation states, cyber criminals and hacktivists – are becoming more sophisticated and dangerous." *Id.* at 2.

Since that designation, the potential vulnerability of the Nation's critical election infrastructure to hostile actors has continued to concern the Department. For example, in the Department's 2024 Homeland Threat Assessment, the Department relayed its assessment that the Nation's

"electoral processes remain an attractive target for many adversaries" and that it "expect[ed] many of them will seek to influence or interfere with the 2024 election." Dkt. 36-7, at 19. In particular, the Department expressed its concern that "[c]yber actors likely will seek to exploit election-related networks and data," including by "routinely attempting to exploit misconfigured or vulnerable public-facing websites, webservers, and election-related informational technology systems." *Id.*

In addition, consistent with the need to invest in election security as a matter of national security, the Administrator has—since Fiscal Year 2023—"included election security as a standalone" priority in the Homeland Security Grant Program. Dkt. 26, at 7. And since that time, the Administrator has "required recipients to devote at least 3 percent of their [Homeland Security Grant Program] awards to" projects that support election security. *Id.* at 7-8.

3. For the 2026 Fiscal Year, Congress appropriated $494 million for the State Homeland Security Grant Program, of which $85.5 million "shall be for Operation Stonegarden." Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, 140 Stat. 773, 789.

And Congress appropriated $584.25 million for the Urban Area Security Initiative. *Id.*

To implement that necessary prioritization and to help ensure that Homeland Security Grant Program funds are directed "toward the most urgent threats facing the nation," the Department's 2026 Notice of Funding Opportunity "identified five [National Priority Areas] that reflect the evolving risk landscape and national policy objectives" and that "serve as a framework for targeting investments that build capability, reduce risk, and promote cross-sector coordination." Dkt. 36-5, at 11. Those National Priority Areas are: "[e]nhancing the protection of soft targets and crowded places," "[s]upporting Homeland Security Task Forces and fusion centers," "[e]nhancing and integrating cybersecurity resiliency," "[e]nhancing election security," and "[s]upporting border crisis response and enforcement." *Id.*

Given the importance of those priorities to the counter-terrorism goals served by the program, the Administrator has determined that grant applicants "should use these priorities to guide planning, investment, and implementation to drive measurable outcomes and long-term resilience." Dkt. 36-5, at 11. And the Administrator has specifically required grant recipients to "allocate at least 30% of their" State Homeland Security

Program and Urban Area Security Initiative Funds to those priorities, with at least 3% of total funds allocated toward enhancing election security (as in previous years) and at least 10% allocated toward supporting border crisis response and enforcement. *Id.*

Related to the 3% election-security allocation requirement, the Administrator further explained that "[s]ecuring election infrastructure, ensuring its continued operation in the face of threats and harassment, advancing the safety of election officials, and protecting against foreign interference are national security priorities." Dkt. 36-5, at 15. In that context, the Administrator explained, it is important for Homeland Security Grant Program recipients to "contribute to a secure, transparent, and resilient electoral process, thereby reinforcing public trust and the integrity of democratic institutions." *Id.* To that end, the Notice required that "each state and high-risk urban area must make at least one investment"—meeting or exceeding the 3% minimum threshold—"that supports physical and/or cyber election security." *Id.* And the Notice further required that "each state and high-risk urban area election jurisdiction" must meet five additional conditions related to election security. *Id.* Those conditions are:

> Submit a transition plan: Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to

count votes to equipment that accepts hand-marked paper ballots. The plan, for all jurisdictions currently using such systems, must include a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots.

Post-election manual audit: Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes.

Voter/ballot reconciliation: Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary.

Voter roll citizenship verification: Utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]. To mitigate operational vulnerabilities exploitable by terrorist or foreign actors and advance [Homeland Security Grant Program] counterterrorism objectives, the State's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database.

Election worker citizenship verification: Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems. To prevent sabotage, infiltration, or foreign interference, the State's chief election official must ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places, consistent with applicable law, thereby hardening critical infrastructure under [Homeland Security Grant Program].

*Id.* at 15-16 (footnote omitted). The Notice explained that to ensure compliance with these conditions, the Administrator will withhold 20% of each grant recipient's total award "until the recipient submits proof of compliance with the" conditions "and the Department verifies/confirms that proof." *Id.* at 16.

4. Plaintiffs are six counties and cities located within the States of Tennessee, Texas, and Ohio; each has previously received grant funding from the relevant State through the Homeland Security Grant Program. Dkt. 26, at 9-19. They brought this suit to challenge the election-security conditions articulated in the 2026 Notice.

Most relevantly here, plaintiffs contend that the challenged conditions exceed the agencies' statutory authority, because (in plaintiffs' view) the underlying statute does not authorize the agencies "to condition the award of [Homeland Security Grant Program] funding on a recipient's adoption of the agencies' preferred election administration policies" or to impose conditions that do not "implement any statutory requirement governing" the program. Dkt. 26, at 41. In addition, plaintiffs initially contended that the conditions violated the constitutional separation of powers, the Constitution's Spending

Clause, and the Constitution's Elections Clause, and that the conditions were arbitrary and capricious and ultra vires. *Id.* at 42-51.

The district court ultimately granted summary judgment to plaintiffs in relevant part, concluding that the challenged election-security conditions are not authorized by the underlying statute. In reaching that conclusion, the court agreed that "the statute would plainly authorize FEMA [to] fund grants that protect against or respond to terrorist attacks on critical election infrastructure." Dkt. 42, at 17. The court explained that election systems are critical infrastructure, that terrorists may conduct physical or cyber attacks against such systems, and that the statute clearly allows the Administrator to award grants to fund "investments into physical and cyber election security." *Id.*

Nonetheless, the district court concluded that statute does not permit the imposition of the election-security conditions, for two reasons. First, the court believed that the statute only authorizes the agency "to fund projects proposed by states and high-risk urban areas" but does not provide any authority to withhold grants unless recipients agree "to carry out the federal government's preferred projects at their own expense." Dkt. 42, at 12-13. And the court believed that the challenged conditions improperly required

grant recipients "to self-fund the various election administration reforms" to receive full grant funding. *Id.* at 13. Second, the court stated that the statute only permits "FEMA to administer the program to assist states and high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism"—not to use the program as a mechanism "for the sort of election administration reforms FEMA demands here" that are not (in the court's view) "advanced to prepare for or respond to 'acts of terrorism.'" *Id.* at 15 (quotation omitted). Finally, to the extent that the statute was ambiguous, the court stated that "the major questions doctrine" and principles of constitutional avoidance would counsel in favor of reading the statute to preclude the Administrator from imposing the challenged conditions. *Id.* at 18-20.

The district court thus granted plaintiffs summary judgment on their claim that the challenged election-security conditions were not authorized by the relevant statute. Dkt. 42, at 21. As a remedy, the court universally vacated the conditions in the Notice (along with a related guidance memorandum). *Id.* at 21-23. And the court dismissed plaintiffs' remaining APA claims without prejudice (and their ultra vires claim with prejudice). *Id.* at 21-22.

The government appealed and moved for a stay pending appeal. Dkts. 44, 45. The district court denied a stay on October 26, 2026. Dkt. 49 (Add.28-36).

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### I. The Challenged Election-Security Conditions Fall Within FEMA's Statutory Authority

1. The Homeland Security Grant Program statute provides FEMA with broad discretion to administer the program as FEMA determines is necessary to best advance the national-security and counter-terrorism goals of the program—including specifically the discretion to prioritize among different grant recipients and proposed projects based on FEMA's determinations of which particular threats are most important to combat and which security measures are most effective. And this is not a formula grant. Other than a requirement that a certain minimum amount of funding be provided to certain grantees—a requirement that FEMA has readily satisfied regardless of the outcome here—FEMA has discretion to increase

or decrease the amount of funds made available to various applicants. That broad discretion encompasses the ability to impose grant conditions to ensure that recipients have undertaken election-security measures that FEMA has determined are critical to protecting national security.

As an initial matter, plaintiffs and the district court correctly have not disputed that election-security measures fall within the broad counterterrorism measures encompassed by the statute. Indeed, the statute expressly reflects that one purpose of the program is to allow States and local jurisdictions to "protect[] a system or asset included on the prioritized critical infrastructure list"—including election systems. 6 U.S.C. § 609(a)(3). And the statute provides the Administrator with express authority to allocate grant funds among different potential recipients based on the Administrator's determination of each recipient's relative threat level—including "its degree of threat, vulnerability, and consequences related to critical infrastructure"—and of the "effectiveness of" each proposed use of funding. *Id.* § 608.

Taking that authority together, it is clear that FEMA has the statutory authority to fund grant projects that are intended to bolster election security, including by (for example) acquiring more secure election machines

or auditing election results to detect any attempted intervention by hostile actors. Indeed, for years, FEMA has required grant recipients to spend at least 3% of their allocated funds on such election-security projects—a requirement that plaintiffs do not challenge and that the district court did not dispute comported with the statute. And given FEMA's broad prioritization authority, FEMA could similarly determine that election-security projects are so important to the national security that such projects will be funded before any discretionary grant funds are allocated to other, non-election-security projects.

In practical effect, however, that is precisely what FEMA has done through the challenged election-security conditions. Before a grant recipient may access full funds for all of its projects, the recipient is required to prioritize accomplishing the specific election-security measures that the Administrator has determined are essential to advancing the national-security and counterterrorism goals of the grant program. As the Notice makes clear, many such projects would be the proper subject of program grants, and so a recipient who wishes to fund its election-security measures with Homeland Security Grant Program funds may choose to include those projects in its application. Or, if a grant recipient has already accomplished

some or all of the identified election-security projects or has identified other sources of funding to accomplish those projects, it may certify its compliance with those important objectives and thereby access full funding for its other proposed projects.

2. The district court's contrary conclusion rests on a misunderstanding of the practical effect of the Notice's conditions and on an improperly cramped understanding of the Administrator's statutory authority.

As an initial matter, the district court's suggestion that the conditions exceed FEMA's authority, because that authority is limited to "fund[ing] projects proposed by state and high-risk urban areas," Dkt. 42, at 12, is misplaced. For one, it reflects a misunderstanding of the practical effect of the conditions. As explained, the Notice makes clear that projects to implement the conditions would be proper subjects of Homeland Security Grant Program funding in many cases—a point that plaintiffs and the district court do not seriously dispute—and so grant applicants may indeed choose to include such projects in their applications.

Thus, far from reflecting an attempt "to extract unfunded reforms," Dkt. 42, at 14, FEMA's structuring of the conditions simply reflects the reality that some States may wish to seek Homeland Security Grant Funding

for other projects rather than election-security projects—perhaps because they already planned to complete the election-security reforms contemplated by the conditions or because they have identified other sources of funding to do so. In that instance, FEMA's framework permits States the flexibility to certify compliance with the election-security requirements that the Administrator has determined reflect a national-security priority while focusing their grant application on other projects that they would prefer to use this specific funding source to pursue.

Regardless, to the extent that the district court believed FEMA's authority was limited to funding proposed projects rather than imposing additional conditions, Dkt. 42, at 12, the court had an unduly narrow conception of FEMA's authority to administer the program. As explained, the statute throughout reflects Congress's determination to vest substantial discretion in FEMA to determine how best to administer and allocate funding within the program to effectively achieve the program's counterterrorism objectives. *See* 6 U.S.C. §§ 608-609. That discretion expressly includes the discretion to evaluate the relative risks posed by different types of threats and to determine which countermeasures are likely to be most effective (and, thus, most deserving of limited government funds).

*See id.* And of course, FEMA must retain discretion to impose conditions to effectively and efficiently administer the program.

Indeed, neither plaintiffs nor the district court have taken issue with FEMA's practice of imposing minimum-allocation conditions that require grant recipients to allocate a percentage of grant funds to FEMA-specified priority areas, even though such conditions too go beyond simply "fund[ing] projects proposed by" recipients, Dkt. 42, at 12. Nor can there be any serious question that FEMA may permissibly impose other conditions on grant recipients that go beyond simply funding proposed projects but instead ensure that the program operates effectively. Thus, FEMA plainly has discretion to, for example, establish timelines for processing payment requirements and disbursing funds, Dkt. 36-5, at 57; require grant recipients to provide "access to records" to allow for audits, *id.* at 65; and determine the "allowable cost activities" for each program, *id.* at 76-95. And in the same vein, FEMA must have the authority to establish conditions to ensure that grant recipients are—before spending their full allocation on other projects—undertaking election-security measures that the Administrator has determined should be prioritized.

The district court's additional conclusion that the election-security conditions reflect mere "election administration reforms" rather than measures "to prepare for or respond to 'acts of terrorism'"—and, thus, are not properly with the scope of the grant program—fares no better. Dkt. 42, at 15. As explained, it is undisputed that election infrastructure has been properly designated as critical infrastructure by the Department and that projects to safeguard such critical infrastructure against hostile actors fall within the scope of the Homeland Security Grant Program; indeed, the district court conceded that the statute "plainly authorize[s]" FEMA to fund grants to protect such infrastructure. Dkt.42, at 17.

In many respects, however, the election-security conditions do just that. For example, one condition requires grant recipients to develop a plan "for transitioning from electronic voting systems" to "equipment that accepts hand-marked paper ballots." Dkt. 36-5, at 15. Such "upgrad[e]s" to "equipment"—especially "critical infrastructure" equipment—plainly fall within the bounds of the statute, 6 U.S.C. § 609(a)(3)-(4), particularly given the Department's longstanding concern that hostile "[c]yber actors" may "seek to exploit election-related networks and data," Dkt. 36-7, at 19; *see also* 6 U.S.C. § 608(b)(3) (recognizing that "[c]yber" threats are one "type[] of

threat" that program funds may be used to combat). Similarly, another condition requires recipients "to verify U.S. citizenship for any person working at a polling place" or "operating any election system" to "prevent sabotage, infiltration, or foreign interference" with election infrastructure. Dkt. 36-5, at 16. Such physical access restrictions are a commonly employed means of safeguarding critical infrastructure against potential hostile actors. *See, e.g.*, 10 C.F.R. § 73.56 (requiring nuclear power licensees to develop an "access authorization program" to limit physical access to sensitive infrastructure). Nowhere did the district court even attempt to explain how these conditions do not reflect proper attempts to combat cyber and physical threats to critical election infrastructure—indeed, the court did not engage in any granular analysis of the conditions themselves as would be necessary to support its conclusion.

Regardless, the Department has long expressed concern about hostile foreign actors' attempting "to undermine" the Nation's "confidence in a free and fair election." Dkt. 36-7, at 19. Even apart from physical or cyber threats to critical election infrastructure, that possibility plainly implicates the threat vulnerabilities targeted by the Homeland Security Grant Program. And the statute here provides broad discretion to FEMA to identify "other types of

threats determined relevant by the Administrator" and to consider such threats in prioritizing program funding. 6 U.S.C. § 608(b)(9); *see also id.* § 609(a)(15) (authorizing FEMA to fund "any other appropriate activity, as determined by the Administrator"). In that context, it falls within FEMA's broad discretionary authority to determine that the program should seek to combat the threat posed by malicious actors who may wish to undermine public confidence in our Nation's elections.

Finally, the district court's gesturing at the major questions doctrine and the limitations on Congress's authority under the Spending Clause provides no firmer basis for the court's conclusion. For one, the statute here unambiguously provides FEMA with the necessary authority to establish the challenged conditions on grant funding, rendering those concerns inapplicable. And regardless, neither concern has merit even on its own terms.

This case bears none of the hallmarks of the handful of "extraordinary cases" where the Supreme Court has invoked the major questions doctrine. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Most fundamentally, FEMA's attempt to use Homeland Security Grant Program funding to safeguard critical election infrastructure is nothing "novel." *Id.* at 716. To the

contrary, as explained, FEMA has for years required recipients to allocate a portion of their funding to such projects. And the distinction between such a minimum-allocation requirement and the conditions at issue here is (as explained) more semantic than practical—and it certainly does not rise to the level of an "extraordinary" claim of new agency authority. *Id.* at 723. Even beyond that, the district court cited no support for the surprising proposition that the major questions doctrine could be implicated by an agency's imposing conditions on its own funding rather than an agency's attempt to use its "regulatory authority" to compel private action. *Id.*

Nor is the Spending Clause relevant here. Under that constitutional provision, Congress may impose conditions on recipients of federal funding so long as those conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992). As explained, the Department has long expressed concern that hostile foreign actors may attempt to infiltrate critical election infrastructure or undermine public confidence in the Nation's elections. The conditions here are aimed at combatting such threats and thus plainly bear the required relationship to the purpose of the grant program, which is entirely aimed at preventing and responding to the threats posed by such hostile actors.

## II. A Stay Pending Appeal Is Warranted

The remaining factors—irreparable harm, the balance of equities, and the public interest—overwhelmingly favor the requested stay.

1. The district court's judgment risks irreparable harm to the government and to the public interest by requiring FEMA to disburse grant funds without conditions that the Administrator has determined are important to safeguarding critical election infrastructure. As in *Department of Education v. California*, the government "is unlikely to recover the grant funds once they are disbursed." 604 U.S. 650, 651-52 (2025) (per curiam). Plaintiffs have not "promised to return withdrawn funds should" the conditions be reinstated (even if they cannot certify compliance). *See id.* at 652 (quotation omitted). Nor is there any reason to believe that the many third parties who would necessarily receive funds—not subject to the challenged conditions—under the district court's order would return that money either. Thus, if the government is forced to disburse unconditioned funds while the court's order is in place, it may well be left with no meaningful recourse to reclaim them even if it prevails.

That harm is compounded by the order's interference with FEMA's ability to implement its preferred policies in a national-security context

where the Administrator has been given broad discretion by Congress to allocate and prioritize funding to most effectively combat the threats that most concern the Administrator. The district court's order requiring the government to administer the Homeland Security Grant Program in a manner that is inconsistent with the Administrator's own policy determinations inflicts a severe separation-of-powers harm. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (explaining that the government is harmed "any time" it "is enjoined by a court from effectuating statutes enacted by representatives of its people" (alteration omitted) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers))).

2. By contrast, plaintiffs' countervailing interest in the district court's order is relatively minimal. As explained, plaintiffs themselves are not even direct recipients of Homeland Security Grant Program funds—they are instead merely subrecipients, who depend on their respective States to determine which projects to request grant funding for and to disburse funds following allocation by FEMA. Those States are not plaintiffs and do not challenge the election-security conditions imposed by FEMA. Particularly in the absence of any complaint from the direct grant recipients, plaintiffs themselves lack a substantial cognizable interest in receiving pass-through

funds unencumbered by conditions agreed to between FEMA and the relevant States. And any interest plaintiffs have is only further diminished by the conditions' structure, which permits FEMA to withhold only 20% of a recipient's funding, ensuring that each recipient has access to the vast majority of the funding even before it certifies compliance.

## CONCLUSION

For the foregoing reasons, the Court should stay pending appeal the district court's judgment.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*/s/ John Bailey*
JOHN BAILEY
*Counsel to the Assistant Attorney General*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*
*John.bailey@usdoj.gov*

October 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,139 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ John Bailey*
John Bailey