No. 26-5368

# In the United States Court of Appeals for the District of Columbia Circuit

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al.*,
*Plaintiffs-Appellees*,

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Columbia
Hon. Amir H. Ali, D.D.C. Case No. 26-cv-2886

## OPPOSITION TO MOTION FOR STAY


Eliza Sweren-Becker
Lauren Miller Karalunas
Derek Tisler
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu

*Counsel for Harris County, City of Columbus, and Nashville*

Toby Merrill
Joshua Karsh
Sharanya (Sai) Mohan
Graham Provost
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit 115
Oakland, CA 94609

*Counsel for Nashville, Harris County, City of Columbus, El Paso County, and Travis County*

Daniel F. Jacobson
Lynn D. Eisenberg
Stephen K. Wirth
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., NW, Suite 301
Washington, DC 20016
(301) 615-2336
dan@jacobsonlawyersgroup.com

Benjamin L. Berwick
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472

Cerin Lindgrensavage
Jacek Pruski
PROTECT DEMOCRACY PROJECT
2020 Penn. Ave. NW, Suite 163
Washington, DC 20006

*Counsel for Nashville, Harris County, City of Columbus, El Paso County, and Travis County*


*(Additional Counsel Listed on Inside Cover)*

Tyler Chance Yarbro
*Director of Law*
John K. Whitaker
*Senior Counsel*
THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY
Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219-6300
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Nashville*

Delia Garza
*County Attorney, Travis County*
Todd A. Clark
OFFICE OF THE TRAVIS COUNTY ATTORNEY
P.O. Box 1748
Austin, Texas 78767
(512) 854-9513
todd.clark@traviscountytx.gov

*Counsel for Travis County*

John Creuzot
*Dallas County Criminal District Attorney*
Jason G. Schuette
*Assistant District Attorney*
OFFICE OF THE DALLAS COUNTY ATTORNEY, CIVIL DIVISION
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202
(214) 653-7358
jason.schuette@dallas.county.org

*Counsel for Dallas County*

Abbie Kamin
*Harris County Attorney*
Neal A. Sarkar
*First Assistant County Attorney*
Daniel David Hu
*Senior Counsel*
Edward Swidriski
*Senior Assistant County Attorney*
OFFICE OF THE HARRIS COUNTY ATTORNEY
1010 Lamar, 11th Floor
Houston, Texas 77002
(713) 274-5101
neal.sarkar@harriscountytx.gov

*Counsel for Harris County*

Christina Sanchez
*El Paso County Attorney*
Bernardo Rafael Cruz
*Assistant County Attorney*
OFFICE OF THE EL PASO COUNTY ATTORNEY
320 S. Campbell St., Suite 200
El Paso, TX 79901
(915) 273-3247
b.cruz@epcountytx.gov

*Counsel for El Paso County*

# TABLE OF CONTENTS

Page

Table of Authorities ..... ii

Glossary ..... iv

Introduction ..... 1

Statement of the Case ..... 3

A. Congress Created the HSGP to Help States and Localities Prevent and Respond to Terrorism ..... 3

B. FEMA Conditions 20% of FY2026 Awards on Election-Administration Changes ..... 4

C. The Conditions Harm Plaintiffs ..... 6

D. Proceedings Below ..... 7

E. Subsequent Developments ..... 8

Legal Standard ..... 9

Argument ..... 9

I. Defendants Have Not Made a Strong Showing that They Are Likely to Succeed on the Merits ..... 9

A. FEMA Lacks Statutory Authority to Impose the Conditions ..... 9

B. The Conditions Violate the Spending Clause ..... 19

II. Defendants Will Not Be Irreparably Harmed Absent a Stay ..... 21

III. The Equities and Public Interest Do Not Support a Stay ..... 25

Conclusion ..... 26

Certificate of Compliance ..... 29

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................18

*Bond v. United States*,
572 U.S. 844 (2014) ....................9

*Dep't of Ed. v. California*,
604 U.S. 650 (2025) ....................23

*Fed. Educ. Ass'n v. Trump*,
No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) ....................24

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ....................21

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019) ....................12

*Hirschfeld v. Bd. of Elecs. in City of N.Y.*,
984 F.2d 35 (2d Cir. 1993) ....................22

*KalshiEX LLC v. CFTC*,
119 F.4th 58 (D.C. Cir. 2024) ....................9, 22

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ....................10, 18

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024) ....................9

*Miot v. Trump*,
No. 26-5050, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026) ....................24

*N.Y. Stock Exch. LLC v. SEC*,
962 F.3d 541 (D.C. Cir. 2020) ....................17

*NFIB v. OSHA*,
595 U.S. 109 (2022) ....................12

*Pennhurst State School & Hospital v. Halderman*,
451 U.S. 1 (1981) ....................20

*People Not Politicians v. Onder*,
No. 26A388, 2026 WL 2883222 (U.S. Sept. 25, 2026) ....................26

*Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*,
29 F.3d 655 (D.C. Cir. 1994) ....................12

*South Dakota v. Dole*,
483 U.S. 203 (1987) ....................21

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
992 F.3d 350 (5th Cir. 2021) ....................20

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
59 F.4th 1124 (11th Cir. 2023) ....................20

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................10

**Statutes**

6 U.S.C.
§ 101(18) ....................15
§ 604(a) ....................3, 15, 21
§ 604(b)(1) ....................3
§ 604(d)(2) ....................4
§ 605(a) ....................3, 15, 21
§ 605(c)(1) ....................4
§ 607 ....................13
§ 608 ....................13
§ 608(a) ....................14
§ 608(a)(1) ....................3
§ 608(b) ....................14
§ 609 ....................11, 13, 15

**Other Authorities**

*Notice of Funding Opportunity Fiscal Year 2024 Homeland Security Grant Program* (2024) ....................4

# GLOSSARY

| | |
|---|---|
| DHS | Department of Homeland Security |
| FEMA | Federal Emergency Management Agency |
| HSGP | Homeland Security Grant Program |
| NOFO | Notice of Funding Opportunity |
| OPSG | Operation Stonegarden |
| SHSP | State Homeland Security Grant Program |
| UASI | Urban Area Security Initiative |

## INTRODUCTION

Twenty-eight days after the district court entered judgment, Defendants filed their stay motion with this Court, offering no explanation for their delay. They cite no concrete, imminent harm they will suffer absent a stay, and there is none.

Defendants' arguments on the merits are equally lacking. Congress created the Homeland Security Grant Program (HSGP) for the sole purpose of providing funding to states and local governments to prevent and respond to "acts of terrorism." For the first time in program history, FEMA announced this year that it would withhold a substantial percentage of these counter-terrorism funds—after the grants are awarded—until the relevant states and local governments comply with five FEMA-prescribed election-administration policies concerning voter registration, the casting and counting of ballots, and election-worker eligibility.

Remarkably, Defendants do not contend that any statute *actually* authorizes FEMA to hold back awarded funds until recipients comply with such conditions. Instead, they assert (erroneously) that they could have *funded* these election-administration reforms under the statute, and that *withholding* funds until recipients implement the measures has the same

"practical effect," which they say is close enough. But federal agencies must have statutory authority for the specific actions they take, not some different action they contend would produce a similar result. Here, the statutory scheme authorizes FEMA to assess terrorism risks in allocating HSGP appropriations among recipients, and to specify permissible counter-terrorism uses of the funds. There is no provision that lets FEMA withhold already-awarded funds until recipients comply with FEMA's policy dictates, using the recipients' own funds if necessary. And the statute certainly does not authorize FEMA to impose requirements concerning election administration that are entirely unrelated to terrorism.

A stay, meanwhile, would cause immediate and substantial harm to Plaintiffs and is likely to cause electoral chaos. The conditions would likely immediately spring into effect in states like Texas that have accepted the awards. That includes conditions imposing onerous requirements for post-election-day audits and ballot reconciliations. Foisting those requirements onto Plaintiff Counties that are already juggling myriad post-election duties threatens to disrupt the orderly canvassing, auditing, and certification of the November 3 election, causing great injury not only to Plaintiffs but to the public interest.

## STATEMENT OF THE CASE

### A. Congress Created the HSGP to Help States and Localities Prevent and Respond to Terrorism

In the same legislation that created the Department of Homeland Security (DHS) following the attacks of September 11, 2001, Congress established the HSGP to assist state, local, and tribal governments "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). Congress tasked FEMA with administering the program, and each year Congress appropriates substantial sums for the program, including more than $1 billion for FY2026. Add.5.

The HSGP has three components: the Urban Area Security Initiative (UASI), the State Homeland Security Grant Program (SHSP), and Operation Stonegarden (OPSG). For UASI, FEMA designates "high risk urban areas" to receive funds, representing a collection of counties and cities in an area that faces terrorism threats. 6 U.S.C. § 604(b)(1). FEMA awards funds for both the UASI and SHSP programs based on "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C. § 608(a)(1). FEMA issues grants to each State, which must pass through at least 80% of the funds to high-risk urban areas (for UASI) and other local-government-subrecipients

(for SHSP). *Id.* §§ 604(d)(2), 605(c)(1). OPSG funds state and local border-security efforts. ECF No. 36-5 at 24–25.

Since FY2023, FEMA has required HSGP recipients to spend at least 3% of their awards "to enhance physical election security and/or cyber election security," provided that the project must "have a demonstrated nexus to achieving target capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism."[1]

### B. FEMA Conditions 20% of FY2026 Awards on Election-Administration Changes

In June 2026, FEMA issued its Notice of Funding Opportunity FY2026 HSGP awards. *See* ECF No. 36-5 ("2026 NOFO"). The 2026 NOFO named the designated high-risk urban areas for FY2026 funding, including areas that encompass each of the Plaintiffs here. *Id.* at 71–73. The NOFO also set forth the specific "allocations" of HSGP funds that each state and high-risk urban area would receive. *Id.* at 69–75.

The 2026 NOFO also announced that, for the first time in program history, FEMA would withhold a substantial portion of each recipient's award

---

[1] *Notice of Funding Opportunity Fiscal Year 2024 Homeland Security Grant Program* 27–28, 33 (2024), https://www.fema.gov/grants/preparedness/homeland-security/fy-24-nofo.

until the recipient complied with FEMA-prescribed policy mandates, using the recipient's own funds as necessary. Specifically, FEMA would withhold 20% of each recipient's HSGP award until it complied with the following five election-administration-conditions (the "Conditions"):

- "Submit a transition plan: Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots."

- "Post-election manual audit: Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary."

- "Voter/ballot reconciliation: Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary."

- "Voter roll citizenship verification: Utilize the [SAVE] system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award."

- "Election worker citizenship verification: Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction."

2026 NOFO at 15–16. The purpose of these Conditions, in FEMA's words, was to "strengthen the integrity of U.S. elections." *Id.* at 15.

On August 10, 2026, FEMA issued guidance for implementing the Conditions, some of which reads like a state election code. ECF No. 28-10, Ex.

C (the "August 10 Guidance") at 3–4. For example, for the 5% audit requirement, FEMA instructed that each county must include "at least 5% of [its] precincts" and "at least 5% of all of the centrally tabulated batches," that "[a]ll ballots . . . must be manually counted," that the county must "conduct the . . . manual count with bi-partisan observers present, and where feasible, provide livestream or recorded video," and that the audit must be "completed in time for results to inform certification decisions." *Id.* at 3–4.

### C. The Conditions Harm Plaintiffs

Plaintiffs are counties and cities in Tennessee, Texas, and Ohio that receive HSGP funds. All but the City of Columbus also administer or fund the administration of elections. Because States are the direct grant recipients, States decide whether to accept the Conditions, and Plaintiffs would be injured no matter what their States decide. If a State refuses the Conditions, sub-recipients in that State such as Plaintiffs would lose at least 20% of their pass-through HSGP funding. If a State accepts them, Plaintiffs will be forced to immediately overhaul their election procedures at significant expense.

The at-risk HSGP funds pay for core counterterrorism capabilities. Nashville expects about $1.32 million in FY2026 HSGP funds for SWAT, bomb squad, and emergency management equipment and training. ECF No. 28-8

¶¶ 7–15. The 20% holdback would cost Harris County roughly $1 to $1.4 million in UASI funds earmarked for terrorism prevention and response, including a vital radio communication system. ECF No. 28-11 ¶¶ 23–25. Columbus's urban area is allocated $3.66 million in UASI funds for needs such as anti-drone technology for mass gatherings. ECF No. 28-13 ¶¶ 16–21.

Compliance with the Conditions would be expensive and time-consuming. As just one example, the Harris County Clerk explained that the required 5% audit would take three to four months, require 300 additional election workers, and cost $3.84 million. ECF No. 28-9 ¶¶ 19–21. It could also interfere with the County's ability to satisfy the audit procedures state law imposes. *Id.* ¶ 21.

### D. Proceedings Below

Plaintiffs sued on August 17, 2026, and moved for expedited partial summary judgment on September 1. ECF Nos. 1, 28. At a September 2 hearing, Defendants said there was "not as much urgency as maybe it appears." Hr'g Tr. at 16–18. They noted that recipients would have 60 days to accept awards and that FEMA "historically" extends acceptance deadlines while litigation "plays out." *Id.*

On September 28, the district court granted partial summary judgment to Plaintiffs on their claim that the Conditions exceed FEMA's statutory authority and vacated them pursuant to the Administrative Procedure Act.

### E. Subsequent Developments

On September 29, 2026 in the parallel case brought by a coalition of States and the District of Columbia challenging the Conditions, Defendants agreed to extend the deadline for the plaintiff States to accept awards until December 15, 2026. *Illinois v. FEMA*, No. 26-cv-485 (D.R.I. Sept. 29, 2026), ECF 43 at 2-3.

In late September, FEMA issued awards to the States. FEMA initially included the Conditions, but on October 7, to comply with the district court's decision, it issued an Information Bulletin amending FY2026 awards to rescind the Conditions. The Bulletin states that "[i]f the [district c]ourt's order is vacated or extinguished, the election administration conditions and 20% holdback will immediately become effective." ECF 48-1 at 4.

On October 22, more than three weeks after the district court's judgment and just twelve days before the November 3 election, Defendants filed a notice of appeal and moved in the district court for a stay. ECF Nos. 44, 45. The district court denied the motion. ECF No. 49.

## LEGAL STANDARD

A stay pending appeal is an "extraordinary" remedy requiring the movant to make a "strong showing" of likely success on the merits and, as a "necessary prerequisite" to a stay, irreparable harm. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63–64 (D.C. Cir. 2024).

## ARGUMENT

### I. Defendants Have Not Made a Strong Showing that They Are Likely to Succeed on the Merits

#### A. FEMA Lacks Statutory Authority to Impose the Conditions

The district court correctly held that FEMA lacks statutory authority to impose the Conditions. Because "[f]ederal agencies . . . are creatures of statute," they "literally have no power to act except to the extent Congress authorized them," and accordingly all of their actions must derive from "some delegation of the requisite legislative authority by Congress." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 911–12 (D.C. Cir. 2024) (cleaned up).

Here, multiple doctrines require FEMA to show a *clear* statement from Congress that it was authorizing FEMA to impose the Conditions. First, a clear statement is required where a proposed interpretation of federal law would intrude upon an "area[] of traditional state responsibility," such as election administration. *Bond v. United States*, 572 U.S. 844, 858 (2014).

Second, whether FEMA may impose detailed election-administration requirements on states and counties, on pain of losing millions in counter-terrorism funds, is a major question of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (cleaned up). Further, the considerations requiring clear authorization for major questions "apply with particular force" where "the purported delegation involves the core congressional power of the purse." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (plurality op.).

Defendants cannot point to any statutory language, let alone clear language, authorizing FEMA to withhold HSGP funding from states and local jurisdictions unless they adopt specific procedures for administering elections. That is the case for multiple independent reasons, as the district court found.

**1.** First, Congress did not authorize FEMA to *withhold* HSGP funds until states and localities—using their own funds as necessary—comply with FEMA's preferred policies. Add.18. Congress certainly did not authorize FEMA to withhold HSGP funds until states and localities implement FEMA's preferred practices for core aspects of election administration, including maintaining voter-registration systems, casting ballots, counting and reconciling ballots, and election-worker eligibility.

Below, it was "undisputed" that "FEMA's rule requires the plaintiff counties and cities, or their states, to *self-fund* the various election administration reforms that the NOFO requires to receive full payment of the counterterrorism grants at issue." Add.16 (emphasis added). And "defendants [did] not point to any text that purports to give FEMA the authority to extract unfunded reforms from states in exchange for grants." Add.17.

Although Defendants now quibble with whether the Conditions impose unfunded mandates, Defendants do not actually claim in their stay motion that any specific statutory text authorizes FEMA to hold back HSGP funds that FEMA has already awarded to states and high-risk urban areas, until they comply with FEMA's policy mandates. *See* Stay Mot. 16–19. Instead, Defendants suggest they *could* have awarded HSGP funds for projects to carry out the Conditions' requirements (under 6 U.S.C. § 609), and that withholding HSGP funds until recipients meet those requirements has the same "practical effect." Mot. 17, 18; *see also id.* at 24 (describing the distinction as "more semantic than practical").

HSGP funds could not lawfully be put toward meeting the Conditions (*see infra*), but even if they could be, that would not render FEMA's actions legal. Agencies "are creatures of statute" that "possess only the authority that

Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). FEMA must have statutory authority to take the specific action it undertook—not some different action the agency says would have the same "practical" consequence. *See Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670–71 (D.C. Cir. 1994) (en banc). Moreover, the notion that *withholding* HSGP funds until recipients take certain measures is practically the same as *providing* HSGP funds to take those measures is nonsensical.

As mentioned, Defendants also seem to suggest—for the first time—that the Conditions might not really be unfunded mandates, because the 2026 NOFO purportedly allows jurisdictions to use the HSGP funds "to implement the conditions," at least "in many cases." Mot. 18. Defendants never made this argument below, even in their stay motion below, and it is clearly waived. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019); Add.30 ("[D]efendants' stay motion does not dispute that FEMA's conditions" impose unfunded mandates.). The 2026 NOFO itself never said that HSGP funds could be used to implement the Conditions, and it did not invite applicants to apply for projects to do that. FEMA has now issued awards for projects that recipients proposed, and Defendants provide no evidence that FEMA funded projects to implement the Conditions.

And it would likely be impossible for Plaintiffs and other jurisdictions to carry out the Conditions with only FY2026 HSGP funds, even if that were a lawful use of the funds (*but see infra*), given that: (1) FEMA is withholding 20% of awards until recipients meet the Conditions; (2) the cost of meeting the Conditions would be enormous, *see, e.g.*, ECF No. 28-3 ¶ 9; ECF No. 28-9 ¶ 21; ECF No. 28-12 ¶ 16; and (3) the statute requires that at least 25% of awards be spent on law-enforcement activities, 6 U.S.C. § 607. Again, Defendants never introduced evidence below showing otherwise.

More importantly, FEMA's actions would be unauthorized as a matter of law even if § 609 permitted FEMA to allow FY2026 HSGP funds to be used for meeting the Conditions (which it does not), and even if some recipients did apply for and receive HSGP funding to carry out the Conditions (of which there is no record evidence). There is simply no statutory authority for FEMA to *withhold* 20% of HSGP awards—funds that FEMA has already awarded to states and high-risk urban areas, for counter-terrorism projects that FEMA has already approved—unless recipients comply with FEMA's policy mandates.

Defendants pressed a different theory below, arguing that 6 U.S.C. § 608 authorized the Conditions. *See* ECF No. 36-1 at 13. It is unclear whether

Defendants still press that argument, but regardless, it fails. Section 608 lists factors for FEMA to consider for only two purposes: designating high-risk urban areas as eligible to receive grants, *id.* § 604(b)(2)(A)(i); and "[i]n allocating funds among States and high-risk urban areas," *id.* § 608(a); *see id.* § 608(b) (listing "types of threat" for FEMA to consider for purposes of § 608(a)). The types of threats listed in § 608(b) thus are relevant only in determining which local jurisdictions should be deemed high-risk urban areas, and how to "allocate" the total amount of HSGP appropriations "among" states and high-risk urban areas.

FEMA is not using the Conditions for either purpose. When issuing the 2026 NOFO, FEMA had already determined the high-risk urban areas for UASI FY2026 funds, and FEMA had already decided the precise allocations of FY2026 funds among those high-risk urban areas (for UASI) and among states (for SHSP). *See* 2026 NOFO, Add. I: HSGP Allocations, at 69-75. Section 608 provides no authority for FEMA to hold back funds that have already been allocated.

**2.** As the district court held, FEMA independently lacks statutory authority to impose the Conditions because they "are not advanced to prepare for or respond to 'acts of terrorism.'" Add.18. By statute, the HSGP program's

sole purpose is to assist states and local jurisdictions "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). FEMA's allocation of funds under § 608(a) focuses on applicants' "relative threat, vulnerability, and consequences from acts of terrorism," and under § 609, FEMA must permit recipients to "use grant funds to achieve target capabilities related to … acts of terrorism." "Terrorism" is statutorily defined, requiring that the act be "dangerous to human life or potentially destructive," and involve "intimidation or coercion" or "mass destruction, assassination, or kidnapping." 6 U.S.C. § 101(18).

The Conditions here concern core aspects of election administration that fall "well outside of preparing for or responding to 'acts of terrorism.'" Add.18. In the 2026 NOFO, FEMA did not even argue that the Conditions go toward preventing or responding to terrorism. FEMA instead described the Conditions as intended "[t]o strengthen the integrity of U.S. elections." ECF 36-5 at 17. And FEMA's August 10 Guidance prescribing detailed requirements for the Conditions—including to have "bipartisan observers present" and to "livestream" the 5% audit—describes the purpose of these requirements as to "support public confidence." ECF No. 28-10 at 4. Whatever

the merit of these requirements as a policy matter, they are not focused on stopping or responding to terrorism.

In their stay motion to this Court, Defendants fail to cite the statutory definition of "terrorism," and they present no argument that the Conditions prevent or respond to acts of terrorism under that definition. Defendants do vaguely claim that, "[i]n many respects," the Conditions protect election infrastructure. Mot. 21–22. But they provide explanations only as to the paper-ballots and election-workers conditions, implicitly conceding that the audit, ballot-reconciliation, and voter-registration conditions do not serve this end. *Id.* That concession alone renders Defendants' actions invalid, because FEMA requires that jurisdictions certify compliance with all five Conditions to have the 20% holdback lifted. Even for the paper-ballots and election-workers conditions, Defendants merely pluck words from the HSGP statutory scheme like "equipment," "cyber," and "critical infrastructure," *see id.*, without explaining how the Conditions relate to those terms in stopping or responding to acts of terrorism.

With respect to "critical infrastructure" in particular, the fact that DHS has designated election infrastructure as critical infrastructure since 2017 does not give FEMA free rein to use the HSGP to impose any election-related

mandates. As the district court explained, Defendants' contrary view has no "limiting principle." Add.31. "[O]n their view, FEMA can condition counterterrorism funding on election administration decisions long at the core of state and local discretion" in administering elections, *id.*, as long as FEMA asserts that the conditions relate to some perceived election-administration "vulnerability," or even just the undermining of "public confidence" in elections. Mot. 1–2, 22–24. Congress, however, did not enact the HSGP and appropriate its funds to address any and all issues related to critical infrastructure.

Without any statutory text to rely upon, Defendants baldly assert that FEMA "must have" or "must retain" authority to impose the Conditions. Mot. 20. That is not how statutory authority works. Agencies must receive an affirmative delegation of authority from Congress to take any action—courts may not "presume" authority "because Congress did not expressly foreclose the possibility." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up).

**3.** Indeed, here, Defendants must show "clear" textual authorization from Congress for FEMA to impose the Conditions, under the clear-statement principles described above. The district court recognized that "[w]hether

FEMA can compel states" to "reform numerous aspects of their election administration," "by withholding hundreds of millions in federal grant money until they comply," is a major question for which clear congressional authorization must be shown. Add.22.

Defendants' responses fall flat. They assert that "the statute here unambiguously provides FEMA with the necessary authority to establish the challenged conditions," but they cite no "unambiguous" statutory provision. *See* Mot. 23. They assert that the major-questions doctrine applies only to an agency's "use of its regulatory authority to compel private action," and not "imposing conditions on its own funding." Mot. 24. But the Supreme Court has expressly rejected this distinction. *Biden v. Nebraska*, 600 U.S. 477, 505 (2023) (applying doctrine in spending context). The Court has held that major-questions principles "apply with particular force" where, as here, "the purported delegation involves the core congressional power of the purse." *Learning Res.*, 607 U.S. at 243.

Defendants also argue that the major-questions doctrine does not apply here because FEMA's imposing the Conditions is not "novel." Mot. 23. But in the two-decade history of the HSGP, FEMA has never done anything

remotely like withholding 20% of HSGP awards until states and counties meet detailed, FEMA-prescribed rules for administering elections.

Defendants point to FEMA's requirement that recipients spend at least 3% of their HSGP funds on election security, Mot. 23. But that requirement regards how recipients use their federal funds on physical or cyber election security that has a specific nexus to terrorism. *Supra* n.1. It is not a withholding until recipients comply with election conditions using their own funds as necessary. And FEMA has permitted jurisdictions to pick "at least one investment" toward meeting the 3% requirement based on the jurisdiction's local needs, unlike the Conditions that imposes numerous detailed requirements resembling a state election code.

FEMA's claimed authority to impose the Conditions would be transformative, and Congress has provided no clear authorization for that asserted power.

### B. The Conditions Violate the Spending Clause

Regardless of whether the HSGP statutory scheme could be interpreted as giving FEMA discretion to impose the Conditions, the Conditions violate the Spending Clause. That is the case for two reasons.

First, the Conditions violate the Spending Clause because *Congress* did not give States clear notice that FEMA could withhold already-awarded HSGP funds until States complied with FEMA-prescribed requirements for conducting elections. "[I]f Congress intends to impose a condition on the grant of federal moneys" to States, "it must do so unambiguously." *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

"[T]he 'needed clarity' under the Spending Clause 'must come directly from the statute.'" *West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (quotations omitted). It cannot come from an agency's later creation of conditions Congress itself did not clearly impose. "Relying on [executive action] to present the clear condition … is an acknowledgment that Congress's condition was not unambiguous," which "would not meet the requirements of *Dole*." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021). Courts accordingly reject funding conditions disclosed only through subsequent executive actions rather than the governing statute. *See, e.g.*, *id.* at 361–62; *Morrisey*, 59 F.4d at 1147.

Here, Congress undisputedly did not specify the Conditions in the HSGP statutory scheme. That alone renders the Conditions in violation of the Spending Clause.

Second, the Conditions violate the Spending Clause because they do not relate "to the federal interest in [the] national projects or programs" being funded. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Congress enacted the HSGP with the sole purpose of assisting states and localities in "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). As the district court held, "the conditions here go well beyond any measure that can reasonably be characterized as related to" that purpose. Add.23. In the 2026 NOFO and implementing guidance, "FEMA itself describes the elections conditions as serving a different purpose, namely to 'strengthen the integrity' of, and 'support public confidence' in, U.S. elections." *Id.* (citations omitted). "[T]his may be a laudable goal, but it is not a counterterrorism goal." *Id.*

## II. Defendants Will Not Be Irreparably Harmed Absent a Stay

Defendants' failure to establish irreparable harm independently suffices to deny a stay.

To begin, Defendants waited 24 days after judgment to seek a stay from the district court. They have offered no explanation for that delay, which belies any notion they face imminent irreparable harm. Add.34; *see Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *Hirschfeld v. Bd. of*

*Elecs. in City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993) (delay "severely undermines the Board's argument that absent a stay irreparable harm would result").

Defendants also fail to identify *any* specific irreparable harm they face. They assert that FEMA will "disburse grant funds without conditions that the Administrator has determined are important to safeguarding critical election infrastructure." Mot. 25. But they identify no imminent, concrete injury to that infrastructure likely to occur during this appeal. They certainly have not demonstrated that the Conditions—and all of the highly prescribed details in FEMA's implementing guidance—are necessary to prevent or respond to terrorism. Just like in *KalshiEX*, the government's asserted interest in election integrity generally cannot substitute for concrete evidence of imminent harm during the appeal. 119 F.4th at 64–66.

Indeed, Defendants' own representations and litigation actions refute any claimed imminent harm. Below, the government asserted that there was not "as much urgency as maybe it appears," including because States had 60 days to accept the awards, and the government could further extend that deadline for litigation to "play out before anyone was forced to commit to accepting the awards." Add.33. Defendants have done precisely that in parallel

litigation brought by 24 states and the District of Columbia. *Illinois v. FEMA*, ECF 43 at 2-3. Moreover, Defendants "repeatedly emphasized" below "that there was no expectation the conditions would be implemented at all (for jurisdictions that do not apply for funding or accept awards) or on any particular timeframe (for jurisdictions that do accept awards)." Add.33.

Defendants' citation (at 25) to *Department of Education v. California*, 604 U.S. 650 (2025), is inapt. Unlike that grant-terminations case, the current administration has awarded these grants—approving the grantees' projects—and FEMA intends for the full award amount to reach recipients. ECF No. 28-10, Ex. C at 2 (FEMA stating the Conditions "affect[] the timing of access to funds, not the amount of the award"). It can hardly be imagined that FEMA will demand that states and localities "return" funds they are putting toward FEMA-approved counterterrorism projects. Mot. 25.

Defendants also have not shown that FEMA will rush disbursements during appellate review, leaving insufficient funds to implement the 20% holdback in the case of reversal. Indeed, Defendants "represented" in parallel litigation "that they can simply enforce the election administration conditions if the conditions are later held to be lawful and that they can do so even after the grant awards have been accepted by states." Add.33. FEMA's post-

vacatur guidance to grantees likewise provides that the Conditions and 20% holdback would "immediately become effective" if the judgment were overturned. Add.34 (quoting ECF No. 48-1 at 4).

Finally, that Defendants will be stopped from implementing their "preferred policies" does not constitute irreparable harm. Mot. 25. This Court has rightly rejected the notion that "the government is irreparably injured any time it is enjoined by a court, particularly when the order at issue maintains the status quo." *Miot v. Trump*, No. 26-5050, 2026 WL 659420, at *2 (D.C. Cir. Mar. 6, 2026) (cleaned up). Such "generalized assertions of injury are insufficient to support a stay pending appeal." *Id.*

Nor does invoking "national security" and "separation of powers" relieve Defendants of their burden to show that *this* particular judgment will cause "certain, great, and imminent injury" during the appeal. *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *3 (D.C. Cir. Sept. 25, 2025) (per curiam). The separation of powers is vindicated, not violated, when a court enforces Congress's limits on agency authority.

## III. The Equities and Public Interest Do Not Support a Stay

In contrast to Defendants' illusory harms, there is "competent and credible evidence" that Plaintiffs will suffer "steep" costs and the public interest would be harmed if a stay were entered. Add.35.

The undisputed record shows that Plaintiffs would unavoidably suffer injury if the Conditions take effect. Plaintiffs would either lose access to HSGP funds or they would be forced to immediately implement the Conditions, likely at the direction of their States that have accepted the awards.[2] ECF No. 28-1 at 14–27. Even after election day, Plaintiffs would likely be directed to comply with at least three conditions in the *current* election—the 5% audit, the ballot reconciliation requirements, and the citizen-election-vendors condition.

In September, Plaintiffs showed that complying with these conditions for the election would "cause significant disruption to state and local election administration," bring them into "conflict with their obligations under state law," and "saddle them with significant (and unfunded) costs." Add.35; *e.g.*, ECF No. 28-12 ¶¶ 18, 25; ECF No. 28-15 ¶¶ 10–16, 21–22; ECF No. 28-4 ¶ 13.

---

[2] Plaintiffs' understanding is that, of the relevant states, at least Texas has already accepted its HSGP award.

Now, it would be virtually impossible for Plaintiffs to implement the Conditions for the current election. "The election is not merely upcoming; it has already started." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026). Ballots are being counted. Election workers and vendors who have not been run through the SAVE database will be assisting with the vast range of post-election-day activities that counties manage. And counties will lack adequate staffing, resources, and preparations to carry out FEMA's detailed requirements for the audit and ballot reconciliation processes. Entering a stay would almost surely "usher in electoral chaos." *Id.* at *2. Or, if Plaintiffs do not carry out the conditions, they will be delayed in receiving counter-terrorism funds until at least the next election when they could certify compliance. Plaintiffs' interests are hardly "minimal" as Defendants claim. Mot. 26.

Finally, the public has an overriding interest in honoring our constitutional structure, in which states have primary authority for administering elections and Congress maintains the power of the purse.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Respectfully submitted,

/s/ *Daniel F. Jacobson*
Daniel F. Jacobson
Lynn D. Eisenberg
Stephen K. Wirth
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., NW, Suite 301
Washington, DC 20016
(301) 615-2336
dan@jacobsonlawyersgroup.com

Benjamin L. Berwick
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472

Cerin Lindgrensavage
Jacek Pruski
PROTECT DEMOCRACY PROJECT
2020 Penn. Ave. NW, Suite 163
Washington, DC 20006

Toby Merrill
Joshua Karsh
Sharanya (Sai) Mohan
Graham Provost
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit 115
Oakland, CA 94609

*Counsel for Nashville, Harris County, City of Columbus, El Paso County, and Travis County*

Eliza Sweren-Becker
Lauren Miller Karalunas
Derek Tisler
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu

*Counsel for Harris County, City of Columbus, and Nashville*

Tyler Chance Yarbro
*Director of Law*
John K. Whitaker
*Senior Counsel*
THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY
Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219-6300
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Nashville*

Delia Garza
*County Attorney, Travis County*
Todd A. Clark
OFFICE OF THE TRAVIS COUNTY ATTORNEY
P.O. Box 1748
Austin, Texas 78767
(512) 854-9513
todd.clark@traviscountytx.gov

*Counsel for Travis County*

John Creuzot
*Dallas County Criminal District Attorney*
/s/ Jason G. Schuette
Jason G. Schuette*
*Assistant District Attorney*
OFFICE OF THE DALLAS COUNTY ATTORNEY, CIVIL DIVISION
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202
(214) 653-7358
jason.schuette@dallas.county.org

*Counsel for Dallas County*

* *Application for admission forthcoming*

Abbie Kamin
*Harris County Attorney*
Neal A. Sarkar
*First Assistant County Attorney*
Daniel David Hu
*Senior Counsel*
Edward Swidriski
*Senior Assistant County Attorney*
OFFICE OF THE HARRIS COUNTY ATTORNEY
1010 Lamar, 11th Floor
Houston, Texas 77002
(713) 274-5101
neal.sarkar@harriscountytx.gov

*Counsel for Harris County*

Christina Sanchez
*El Paso County Attorney*
Bernardo Rafael Cruz
*Assistant County Attorney*
OFFICE OF THE EL PASO COUNTY ATTORNEY
320 S. Campbell St., Suite 200
El Paso, TX 79901
(915) 273-3247
b.cruz@epcountytx.gov

*Counsel for El Paso County*

November 5, 2026

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,134 words. I further certify that this filing complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared in a proportionally spaced typeface using 14-point Century font.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson